**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ENRIQUE ANTHONY GODOY,
*Petitioner-Appellant*,

v.

MARION SPEARMAN,
*Respondent-Appellee.*

No. 13-56024

D.C. No.
2:10-cv-07927-R-AGR

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted September 2, 2015
Pasadena, California

Filed August 25, 2016

Before: Diarmuid F. O'Scannlain, Raymond C. Fisher,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge O'Scannlain;
Dissent by Judge Fisher

## SUMMARY[*]

### Habeas Corpus

The panel affirmed the district court's judgment denying California state prisoner Enrique Anthony Godoy's habeas corpus petition challenging his second-degree murder conviction based on juror misconduct, the denial of an evidentiary hearing, and the denial of a continuance.

Because it was bound by *Tarango v. McDaniel*, 815 F.3d 1211 (9th Cir. 2016), the panel assumed that Godoy was entitled under clearly established law to a presumption of prejudice from a juror's alleged misconduct – i.e., that she was conferring with a "judge up north" during the trial. The panel held that the California Court of Appeal did not unreasonably apply clearly established law in concluding that the government had rebutted the presumption. The panel rejected Godoy's contention that the California Court of Appeal unreasonably determined the facts by failing to consider additional evidence on direct appeal that Godoy offered in his state habeas petition.

The panel rejected Godoy's contention that the California Court of Appeal unreasonably applied clearly established federal law when it concluded that the state trial court was within its discretion in refusing Godoy's request for an additional evidentiary hearing to investigate his juror misconduct claim.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the California Court of Appeal's affirmance of the trial judge's denial of Godoy's motion for a third continuance was not unreasonable.

Dissenting, Judge Fisher wrote that the California Court of Appeal denied an evidentiary hearing on the juror misconduct claim under the wrong legal rule, and then unreasonably applied *Remmer v. United States*, 347 U.S. 227 (1954), in concluding the presumption of prejudice was rebutted.

## COUNSEL

Stephanie M. Adraktas (argued), Berkeley, California, for Petitioner-Appellant.

Stephanie A. Miyoshi (argued) and Colleen M. Tiedemann, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald Engler, Chief Assistant Attorney General; Kamela D. Harris, Attorney General of California; Office of the Attorney General, Los Angeles, California, for Respondent-Appellee.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a state appellate court's affirmance of a conviction for second degree murder, along with its denial of a request for an evidentiary hearing and for a continuance, were contrary to, or involved an unreasonable application of, clearly established federal constitutional law.

I

A

Enrique Godoy and several friends were standing on the balcony of his apartment in Los Angeles when Chasen Pacheco, an acquaintance of Godoy, appeared below. Pacheco had been a friend until a recent dispute over marijuana, and asked Godoy "to come downstairs so he could talk to him." There, Godoy and Pacheco started wrestling on the grass and throwing punches at each other.

Godoy's friends soon broke up the fight, and one friend, Brett Voegeli, grabbed Godoy and pulled him up the stairs. Pacheco continued to talk to Godoy, imploring him to go back down "to finish the fight." Eventually, Godoy's friend Rodolfo Hernandez, standing nearby, heard Godoy say, "Let me finish him off."

When Pacheco reached the top of the stairs, Voegeli tried to intervene, but Pacheco pulled him out of the way and said to Godoy, "Let's finish this." Pacheco had nothing in his hands and did not try to hit Godoy, and instead, asked "What's up?" Godoy then stabbed Pacheco three times in the

chest and stomach and punched him in the face. Godoy said, "That's what's up" and, "Get the fuck out of here." Pacheco later died from the stab wounds.

## B

In due course, a Los Angeles County Superior Court jury convicted Godoy of second degree murder. An initial sentencing hearing took place on April 27, 2006, whereupon Godoy's counsel requested a forty-day continuance to prepare a motion for a new trial. The trial court granted the continuance, and set a new hearing date for June 12th. The court also instructed defense counsel to serve the prosecutor with his motion by May 30th.

One week after the due date, Godoy's counsel filed his motion for a new trial and served it to the prosecutor. In that motion, he asserted among other complaints that one of the active jurors in Godoy's trial, labeled Juror 10, committed misconduct by "conferr[ing] with a person referred to as a Judge up North." In a subsequent response to the prosecutor's motion opposing a new trial, Godoy's counsel stated that he would "present live witness testimony or declarations from jury panel [sic] at the time of hearing." On June 8th, the prosecutor requested discovery on any witnesses the defense planned on calling at the upcoming hearing. Godoy's counsel stated that he would fax the names of such witnesses that day, but failed to do so.

At the June 12th hearing, Godoy's counsel claimed that two alternate jurors told him that "there was a juror who was text messaging and speaking with a judge up north" during trial. He stated that one of these jurors, an alternate referred to in the record as E.M., was present and ready to testify. The

prosecutor asked for a continuance, pointing out that Godoy's counsel had not disclosed the names and expected testimony of potential witnesses as promised and as California law requires. The court ruled that the prosecutor was entitled to discovery of witness statements the defense would offer, and therefore continued the hearing again to June 29th.

On June 22, Godoy's counsel sent the prosecutor a declaration from a second alternate juror, referred to as N.L. This declaration stated that during trial, Juror 10 exchanged text messages with her "judge friend." The declaration stated that "[w]hen the jury was not sure what was going on or what procedurally would happen next, juror number ten would communicate with her friend and disclose to the jury what he said." In response to these allegations, the prosecutor filed a second supplemental response to Godoy's motion for a new trial. She asserted that N.L.'s statements demonstrated that the communications between Juror 10 and her "judge friend" concerned only procedural matters rather than matters relevant to the jury's deliberation or the verdict.

On June 28th, one day before the scheduled hearing, Godoy's counsel filed a motion requesting an additional thirty-day continuance. He stated that he required this additional continuance because he was "engaged in trial" in another murder case, and because the prosecutor filed her second response to Godoy's motion—the response to defense counsel's surprise arguments at the previous hearing—while he was in trial. The state opposed the motion, arguing that Godoy's counsel had adequate time to prepare.

At the hearing the next day, the court denied defense counsel's motion to continue the hearing for a third time, finding that "there [was] no legal cause stated." During this

exchange, the court repeatedly asked Godoy's counsel whether he had more affidavits or evidence relevant to the juror misconduct issue that he would like to present. Counsel stated he was "not prepared" because he had been busy with the other trial. Having considered N.L.'s affidavit along with arguments previously offered by Godoy's counsel and the prosecution, the trial judge then denied Godoy's motion for a new trial.

C

Godoy appealed his conviction to the California Court of Appeal, arguing that the trial court erred in denying the motion for a new trial on the basis of juror misconduct. While his direct appeal was pending, Godoy also filed a petition for writ of habeas corpus in the same court. As part of his habeas petition, Godoy included an additional declaration from E.M.—the alternate juror Godoy's lawyer brought unannounced to the first hearing—as well as supporting declarations from Godoy's trial counsel and appellate counsel. E.M.'s declaration elaborated on Juror 10's alleged misconduct with her "judge friend" up north. According to E.M., Juror 10 texted her judge friend to ask what would happen after the trial judge informed the jury that he had to leave for a medical procedure. E.M. also asserted that Juror 10 received advice from her "judge friend" to write the trial judge a note in an attempt to be excused from jury duty.

On March 18, 2009, the California Court of Appeal took judicial notice of the record submitted with Godoy's direct appeal and denied Godoy's request to consolidate his habeas petition and his direct appeal. The Court of Appeal then denied his habeas petition on the merits, concluding that

Godoy had "fail[ed] to state a prima facie case for relief." That same day, on direct appeal, the Court of Appeal affirmed Godoy's conviction in an unpublished opinion. Godoy filed petitions for review of both decisions in the California Supreme Court, which were summarily denied on July 8, 2009.[1]

## D

On October 21, 2010, Godoy filed his federal habeas petition. After accepting findings and recommendation of the magistrate judge, the district court denied the petition on May 15, 2013. The district court also denied Godoy a certificate of appealability.

Godoy filed a timely notice of appeal, and we granted Godoy's request for a certificate of appealability for the issues raised in this appeal.

## II

## A

We review de novo a district court's denial of a § 2254 habeas corpus petition. *Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc). Because Godoy filed his petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of his claims. *Estrella v. Ollison*, 668 F.3d 593, 597 (9th Cir. 2011). Under

---

[1] Godoy subsequently filed another habeas petition in the California Supreme Court. However, because that petition raised only additional claims unrelated to those certified for our review, it is not relevant to our analysis.

AEDPA, when a state court has adjudicated a claim on the merits, a district court may not grant a habeas petition unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" Supreme Court precedent where "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case." *White v. Woodall*, 134 S. Ct. 1697, 1705 (quoting *Williams*, 529 U.S. at 407–08). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. Likewise, a state court's refusal to *extend* Supreme Court precedent is not an unreasonable *application* of that precedent. *See White*, 134 S. Ct. at 1706. Ultimately, "[a] state court's determination that a claim lacks merit precludes

federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (internal quotation marks omitted). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

Under § 2254(d)(2)'s factual determination prong, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A state court unreasonably determines the facts where the "'process employed by the state court is defective,' or 'if no finding was made by the state court at all.'" *Hernandez v. Holland*, 750 F.3d 843, 857 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004)). Under this prong, the question is "'not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). This is "'a daunting standard—one that will be satisfied in relatively few cases.'" *Hernandez*, 750 F.3d at 857 (quoting *Taylor*, 366 F.3d at 999).

B

When assessing a state court's determination, "we look 'to the last reasoned decision' that finally resolves the claim at issue." *Amado v. Gonzalez*, 758 F.3d 1119, 1130 (9th Cir. 2014) (quoting *Yist v. Nunnemaker*, 501 U.S. 797, 804 (1991)). Godoy does not attempt to pinpoint which state court decision serves as the basis for his habeas claim.

Instead, he levels arguments at both the California Court of Appeal's opinion on direct review as well as its one-sentence denial of his habeas petition. Because the California Supreme Court summarily denied review of both decisions, we must "look through" these summary denials to uncover the last reasoned decision on the merits. *See McCormick v. Adams*, 621 F.3d 970, 976 (9th Cir. 2010); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003).

It is difficult if not impossible to determine which California Court of Appeal decision is the *last* reasoned decision in this case, since the Court of Appeal affirmed Godoy's conviction and denied his habeas petition on the same day. That said, we doubt the denial of Godoy's habeas petition can properly be considered a reasoned decision, since it states only that Godoy had "fail[ed] to state a prima facie case for relief." *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 n.12 (2011) (equating a state court's determination that "the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief" with a summary denial on the merits (quoting *In re Clark*, 5 Cal. 4th 750, 770 (1993))). Thus, we ask whether the Court of Appeal's decision affirming Godoy's conviction on direct review was so egregious that it transgressed AEDPA's demanding standards.

III

Under the Sixth and Fourteenth Amendments, a criminal defendant has the right to be tried by an impartial jury. *See* U.S. Const. amend. VI; *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965) (applying the Sixth Amendment right to the States via the Fourteenth Amendment). Consistent with that guarantee, the Supreme Court has applied a presumption of

prejudice to certain kinds of juror misconduct, but has also stated that such presumption may be rebutted where the government demonstrates that the illicit contact with the juror was harmless. *See Remmer v. United States*, 347 U.S. 227, 229 (1954); *Mattox v. United States*, 146 U.S. 140, 150 (1892). An overlapping line of Supreme Court precedent has indicated that due process also requires "a trial judge [to be] ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see also Remmer*, 347 U.S. at 229–30. This appeal requires us to interpret these precedents in order to determine: (1) whether the California Court of Appeal unreasonably applied clearly established federal law by concluding that the government had rebutted a presumption of prejudice; and (2) whether the California Court of Appeal acted contrary to or unreasonably applied clearly established federal law in determining that the trial judge was not required to conduct an additional hearing.

A

Godoy first argues that he is entitled to a presumption of prejudice under *Remmer*, *Mattox*, and *Turner*, and that the California Court of Appeal unreasonably applied clearly established federal law by failing to place the burden on the government.

1

The Supreme Court's first and rather oblique statement concerning a presumption of prejudice triggered by egregious juror misconduct occurred more than a century ago. In *Mattox*, a defendant presented juror affidavits stating that a bailiff told the jury that the defendant on trial for murder had

already killed two other people and that the jury had read a newspaper article asserting that the evidence against the defendant was so strong that he would be a "lucky man" if found innocent.  146 U.S. at 143.  The Court held the trial court erred in refusing to consider these allegations and reversed the defendant's conviction, stating that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict unless their harmlessness is made to appear." *Id.* at 150.

Some fifty years later, the Court refined the *Mattox* rule when considering a similar instance of juror misconduct in *Remmer*.  There, an individual later found to be a friend of the accused told the jury foreman that he "could profit by bringing in a verdict" favorable to the defendant.  347 U.S. at 228–29; *Remmer v. United States*, 350 U.S. 377, 380 (1956) (*Remmer II*).  The jury foreman reported the incident to the trial judge, who in turn requested an investigation by the FBI. *Remmer*, 347 U.S. at 228.  The FBI questioned the juror about the incident but shared its report only with the judge and the prosecutor, who concluded that the communication was likely made in jest.  *Id.*   When the defendant learned of the communication and the subsequent investigation, his counsel brought a motion for a new trial which the trial court denied without a hearing.   Citing *Mattox*, the Supreme Court remanded for a hearing and observed that "[i]n a criminal case, any private communication . . . with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial," but that such presumption may be rebutted where "the Government . . . establish[es], after notice to and hearing of the defendant, that such contact with the juror was harmless." *Id.* at 229 (citing *Mattox*, 146 U.S. at 148–50).  Following the required hearing

at the district court and a subsequent petition for certiorari, the Supreme Court again considered the case and concluded that the government failed to carry its burden in demonstrating that the bribery offer did not affect the juror's "freedom of action as a juror." *Remmer II*, 350 U.S. at 381.**[2]**

In *Turner*, the Supreme Court held that a defendant's constitutional rights had been violated when the key witnesses in a murder prosecution—two local sheriffs—were also charged with providing for the jury's daily needs including transportation, meals, and lodging. 379 U.S. at 468–69. The Supreme Court held that kind of "continuous and intimate association" triggered a presumption of prejudice because of the "extreme prejudice inherent in th[e] continual association between the jurors and . . . key witnesses for the prosecution." *Id.* at 473.

Reading these cases at face value, we are skeptical that any of them clearly establish that the allegations contained in N.L.'s declaration entitled Godoy to a presumption of prejudice under clearly established federal law. *Remmer* presumed prejudice where the underlying conduct involved a credible allegation of outright jury tampering. *See United States v. Dutkel*, 192 F.3d 893, 894–85 (9th Cir. 1999)

---

**[2]** During its initial consideration of the case, the Supreme Court speculated that "[t]he sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly." *Remmer*, 347 U.S. at 229. Having granted certiorari a second time, however, the Court observed that the district court's subsequent investigation made plain that the F.B.I. interview was not in fact a source of prejudice. Rather, it was the initial bribery offer that rendered the juror "a disturbed and troubled man," and the F.B.I. interview merely failed to "disperse the cloud created by" this offer. *Remmer II*, 350 U.S. at 381–82.

(distinguishing jury tampering from "more prosaic kinds of jury misconduct" and concluding that "the Supreme Court in *Remmer* announced a special rule dealing with jury tampering"). Moreover, unlike the communications at issue in either *Mattox* or *Remmer*, N.L.'s declaration contained no allegation that the alleged contact between Juror 10 and the "judge up north" concerned "the matter pending before the jury" such as Godoy's guilt or innocence or a verdict the jury should render. *Remmer*, 347 U.S. at 229; *Mattox* 146 U.S. at 142–43. Admittedly, we have held that *Mattox*'s presumption of prejudice may apply irrespective of a communication's content where the unauthorized communication is "between a juror and a witness or interested party." *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 696 (9th Cir. 2004). But even this ruling is little help to Godoy, since the "judge up north" who allegedly responded to Juror 10's texting was neither a witness nor otherwise interested in Godoy's trial. Nor does the juror misconduct alleged by Godoy involve a "continuous and intimate association" between a juror and anyone participating in Godoy's trial. *Turner*, 379 U.S. at 473. "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *White*, 134 S. Ct. at 1706.

Subsequent to argument in Godoy's case, however, our Court decided *Tarango v. McDaniel*, 815 F.3d 1211 (9th Cir. 2016). In *Tarango*, we stated that *Mattox* "compels a criminal trial court to consider the prejudicial effect of *any* external contact that has a 'tendency' to influence the verdict." *Id.* at 1221 (citing *Mattox*, 146 U.S. at 150–51). We held further that a tendency to influence the verdict exists *per se* and triggers a presumption of prejudice whenever there

is "unauthorized external contact between a juror and a government agent, whose official position 'beyond question carries great weight with a jury.'" *Id.* at 1223 (quoting *Parker v. Gladden*, 385 U.S. 363, 365 (1966) (per curiam)).

We question the correctness of *Tarango*'s broad holding, especially in light of the Supreme Court's admonitions to "lower courts—and the Ninth Circuit in particular—against 'framing our precedents at . . . a high level of generality.'" *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam) (quoting *Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013) (per curiam)). Because we are bound by *Tarango*, however, we assume that Godoy was entitled to a presumption of prejudice under clearly established federal law.

2

Even assuming a presumption of prejudice applies in Godoy's case, however, we have little trouble holding that the California Court of Appeal's analysis did not unreasonably apply clearly established federal law by concluding the government had rebutted the presumption.

When considering Godoy's claim, the Court of Appeal first noted that under California law "[j]ury misconduct raises a rebuttable presumption of prejudice," and assessed Godoy's claim in a section of its opinion entitled "Juror Misconduct: Presumption of Prejudice." The court also identified in no uncertain terms that Godoy's argument centered on his assertion that "the judgment must be reversed because the People did not rebut th[e] presumption," and responded by concluding that the government had indeed carried its burden. The court first observed—in accordance with the government's argument to the trial court—that N.L. had no

personal knowledge of jury deliberations due to his role as an alternate. Moreover, the court noted that although N.L.'s declaration vaguely asserted that Juror 10's communications involved questions about "what was going on," neither that ambiguous assertion nor anything else in N.L.'s declaration actually stated that "the 'judge friend' communicated information prejudicial to" Godoy or the prosecution. Finally, the court reasoned that, when read in the fairest light, N.L.'s declaration suggested that any information furnished by Juror 10's "judge friend" related to "procedural matters," not Godoy's guilt or innocence. On any plain reading of the record, it cannot be said that the court misallocated the burden to Godoy or unreasonably applied Supreme Court precedent.

In spite of the clear text of the Court of Appeal's opinion, Godoy argues that the court's application of the presumption of prejudice unreasonably applied Supreme Court precedent because the court did not "take testimony." The dissent likewise argues that the state court's decision was contrary to *Remmer* because the government failed to introduce additional "contrary evidence." Dissent at 34. Those arguments also fail. Neither *Remmer* nor any other case requires that the government present testimony or any other new evidence to rebut the presumption of prejudice created by juror misconduct. Indeed, *Remmer* says only that the government is required to "establish . . . that [the] contact with the juror was harmless"—it says nothing about any requirement that the government present affirmative evidence to rebut the presumption. *Remmer*, 347 U.S. at 229; *see also Mattox*, 146 U.S. at 150 (stating only that the presumption is rebutted where the "harmlessness [of juror misconduct] is made to appear").

The dissent points to *Remmer*'s observation that the "burden rests heavily on the Government" as clearly establishing that the government must present evidence to carry its burden. Dissent at 34. But *Remmer* does not compel the dissent's conclusion that this means the government maintains a heavy burden *to produce evidence* to defeat the defendant's claim of juror misconduct. To the contrary, the observation can quite reasonably be read to mean that the government bears a burden to persuade the court that there was no prejudice. Thus, if the court cannot determine the nature of the alleged prejudice, the presumption means that the tie goes to the defendant. But that does not mean that the government can prevail only by ferreting out new evidence, rather than (as was done here) by pointing to evidence already within the existing record that contradicts the notion of prejudice.

In short, nothing in *Remmer* or elsewhere comes close to establishing that the California Court of Appeal erred "beyond any possibility for fairminded disagreement" in concluding that the government had satisfied its burden on the basis of the existing record. *Harrington*, 562 U.S. at 103. The Court of Appeal did not unreasonably apply clearly established federal law in concluding the presumption had been rebutted.

3

Godoy next argues that, even granting that the Court of Appeal applied a presumption of prejudice consistent with clearly established federal law, it nonetheless unreasonably determined the facts because it "inexplicably" failed to consider the additional evidence on direct appeal that Godoy offered in his habeas petition, and instead merely

"speculated" about the harmlessness of Juror 10's alleged misconduct. Again, we disagree.

The Court of Appeal clearly stated that it limited its discussion to N.L.'s declaration because this was "the only evidence before the [trial] court." *See People v. Waidla*, 996 P.2d 46 (Cal. 2000) (observing that "[a]ppellate jurisdiction is limited to the four corners of the [underlying] record on appeal" (quoting *In re Carpenter*, 889 P.2d 985, 992 (Cal. 2000))). Furthermore, even if the court were to have considered the expanded record—which, incidentally, it did when considering and rejecting Godoy's habeas petition—there would have been no difference in the result. The only differences between the record before the California Court of Appeal on direct review and on habeas review were the declaration of alternate juror E.M. and supporting declarations of trial and appellate counsel. Contrary to Godoy's assertion, however, this additional evidence adds nothing to his claim.

E.M.'s declaration contained the same allegations as N.L.'s, stating in broad terms that "throughout the trial," Juror 10 communicated "about the case" with her "'judge friend' up north." Yet unlike N.L., E.M. also recounted the specifics of several communications between Juror 10 and her "judge friend." According to E.M., "Juror 10's judge friend told her that she should write a note to give Judge Sheldon so that she would be excused from jury duty. Juror 10 did write a note which she gave to Judge Sheldon." Similarly, E.M. stated that when "jurors learned that Judge Sheldon had to leave for a medical procedure[,] Juror 10's judge friend told her that if our trial judge had to be absent, that another judge would take his place. That, in fact, occurred." We fail to see how the court's decision constituted an unreasonable

determination of the facts, especially when the additional evidence highlighted by Godoy further *bolsters* the court's conclusion that such communications were not a source of prejudice.

Because the Court of Appeal did not act contrary to or unreasonably apply clearly established federal law when analyzing prejudice, Godoy is not entitled to relief on this ground.

B

Godoy next argues that the Court of Appeal unreasonably applied clearly established federal law when it concluded that the state trial court was within its discretion in refusing Godoy's request for an additional evidentiary hearing to investigate his juror misconduct claim. Contrary to Godoy's assertions, however, neither *Remmer* nor *Smith v. Phillips*, 455 U.S. 209 (1982), clearly establish that Godoy was entitled to any hearing beyond what he already received.

1

As we have already explained, in *Remmer* the Supreme Court found a criminal defendant's right to an impartial jury was violated where a trial court dismissed allegations of juror misconduct after an *ex parte* meeting with prosecutors. *Remmer*, 347 U.S. at 228–29. In that context, the Supreme Court sensibly held that a trial court "should not decide and take final action ex parte," but instead should "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing *with all interested parties permitted to participate*." *Id.* at 229–30 (emphasis added). We have observed elsewhere that such a holding

"provides little prospective guidance as to when a hearing is required or even appropriate." *Sims v. Rowland*, 414 F.3d 1148, 1154 (9th Cir. 2005). Indeed, a "plausible reading posits that the *Remmer* Court merely condemned the *ex parte* manner in which the trial judge and the prosecutor handled the situation without the knowledge of the defendant or his counsel." *Id.*

In *Smith v. Phillips*, a defendant claimed that his convictions for multiple counts of murder and attempted murder should be vacated because a juror in his case had submitted an application to work as an investigator in the district attorney's office. 455 U.S. at 212. Following the verdict, the district attorney learned of the juror's application and informed the trial court and Smith's attorney. *Id.* at 213. At a post-trial hearing, the trial court heard testimony from the juror and determined that although the letter of application was an "indiscretion," it did not improperly influence the juror's vote. *Id.* at 213–14. A federal district court granted the defendant's habeas petition and the Second Circuit affirmed, holding that the failure of the prosecuting attorneys to alert the court of the juror's application when they first learned of it violated due process. *Id.* at 214. The Supreme Court reversed.

Focusing its analysis on the adequacy of the hearing conducted after the trial, the Court concluded that the trial judge's investigation of the allegations of juror misconduct sufficiently protected the defendant's due process rights. *Id.* at 215–18 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). In so holding, however, the Court declined to establish a rule requiring a separate hearing whenever there are allegations of

juror misconduct.  Rather, the Court explained, "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and *to determine the effect of such occurrences when they happen*." *Id.* at 217 (emphasis added).  The Court has recently reiterated this rule, stating that a "suggestion of prejudice" should prompt courts to "determine whether any juror has been directly tainted." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1894 (2016).

Notably absent from these cases is any strict requirement to hold an evidentiary hearing in the course of the court's investigation into prejudice.  As we have recognized, "*Remmer* and *Smith* do not stand for the proposition that *any time* evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias." *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003).  Instead, we have concluded on several occasions that *Remmer* and *Smith* leave trial courts with flexibility to determine when an evidentiary hearing is appropriate.

Our previous precedents illustrate the "flexible rule" governing a court's investigation of juror misconduct that *Remmer* and *Smith* established.  *Id.* at 1044. For instance, in *Tracey*, a petitioner claimed the state court violated clearly established federal law when it failed to question several jurors who had told another juror before and after voir dire that they "felt [the defendant] was guilty" and questioned whether there was "any question in reference to the verdict." *Id.* at 1039.  We held that the trial court's decision not to question these jurors was not contrary to *Remmer* or *Smith*, because the court complied with *Smith*'s command to "determine the effect of [prejudicial] occurrences when they happen" by examining the statements and concluding that the

"nature and timing of the bias" was insufficient to necessitate further inquiry. *Id.* at 1044–45 (quoting *Smith*, 455 U.S. at 217 (alteration added)).

Likewise, in *Sims*, we held that neither *Remmer* nor *Smith* demand that a judge conduct a hearing *sua sponte* into allegations of juror misconduct. 414 F.3d at 1155. In so holding, we again concluded that "*Smith* and *Remmer* do not stand for the proposition that a hearing is required in every case of potential juror bias." *Id.* We also noted that the "flexible rule" evinced by *Remmer* and *Smith* reflects our own circuit precedent that a court should "'consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source' when determining whether a hearing is required." *Id.* at 1155 (quoting *Tracey*, 341 F.3d at 1044).

2

In light of the Supreme Court's precedents and our past reading of them, we have little trouble concluding that the Court of Appeal did not err "beyond any possibility for fairminded disagreement" in ruling that no further hearing was required.

In its opinion, the California Court of Appeal noted that the trial court possessed "discretion" over whether to hold an evidentiary hearing, and that such a hearing "should be held only where the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred." The Court of Appeal then concluded that the trial court properly reasoned that such a showing was absent in Godoy's case, because N.L. was an alternate juror with no personal knowledge of jury deliberations and because the

alleged communications between the absent judge and Juror 10 "related to procedural matters rather than appellant's guilt." We hardly think such a conclusion was unreasonable, not least because the trial court's actions clearly fell within the "flexible" parameters the Supreme Court's cases demarcate. *Tracey*, 341 F.3d at 1044.

Moreover, Godoy *did* have the opportunity to present testimony in favor of his juror misconduct claim. Prior to the first hearing on Godoy's motion for a new trial, Godoy's lawyer stated that he would "present live witness testimony or declarations from [the] jury panel at the time of the hearing" about Juror 10's misconduct. Yet Godoy's counsel failed to provide the prosecution any information on the witnesses he planned to call despite a promise to do so. Nor did he provide any declaration or other information to the court stating what the content of his witness's testimony would be. He simply showed up at the hearing and insisted that E.M. should be permitted to testify. After expressing concern about the prosecutor's lack of discovery and the uncertain admissibility of E.M.'s testimony since he had "no idea what [she] may testify to," the trial judge decided not to "hear testimony from [E.M.] today." Instead, he ordered a continuance and instructed Godoy's counsel to provide the names of any potential witnesses to the prosecutor "well in advance" of the next hearing.

Godoy's counsel never provided a declaration from E.M. Roughly one week before the rescheduled hearing, however, he sent an affidavit from N.L. to the prosecutor and the court. Yet on the day of the hearing, Godoy's counsel admitted that he was "not prepared" and that he had not brought N.L. to the hearing because he assumed the court would grant his motion for an additional continuance which he filed the day before.

During the course of the conversation, the court repeatedly asked Godoy whether he had "any other juror's affidavit" in addition to N.L.'s that he wished to submit. Godoy's counsel admitted he did not, but complained that the judge "refused to allow the sworn testimony" of E.M. at the last hearing. In response, the judge explained that under California law, he was obligated to examine an affidavit of any juror to determine whether the juror's statements would be admissible before he could consider their merits. Having examined N.L.'s declaration, the trial judge then denied Godoy's motion for a new trial.

There is little doubt that the trial court here did everything required by *Smith* and *Remmer* to "determine the effect of [prejudicial] occurrences when they happen." *Smith*, 455 U.S. at 217 (alteration added). Indeed, the trial court gave Godoy's counsel not one but two chances to present testimony from E.M., N.L., or any other juror. He failed to take advantage of either opportunity. Moreover, the trial court "consider[ed] the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source" insofar as he reviewed N.L.'s declaration and concluded no further inquiry was necessary. *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993). In light of such facts, we can hardly conclude that the trial court acted unreasonably, much less in a way that contravened "clearly established Federal law." 28 U.S.C. § 2254(d)(1).

The dissent argues that the trial court transgressed clearly established federal law when it concluded that Godoy was not entitled to a separate evidentiary hearing because he failed to demonstrate a "strong possibility" that prejudicial misconduct occurred. Dissent at 42. But we fail to see how the court's application of this standard or any other makes any

difference, since here the trial court undisputably "determine[d] . . . whether or not [the communication] was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer*, 347 U.S. at 230. Moreover, we are mystified by the dissent's insistence that the trial court's investigation was not "reasonably calculated to resolve the doubts raised about the juror's impartiality." Dissent at 48 (quoting *Dyer v. Calderon*, 151 F.3d 970, 974–75 (9th Cir. 1998) (en banc)). The trial judge held not one but two hearings on Godoy's allegations of juror misconduct, reviewed the affidavit submitted by Godoy's counsel, and heard from the parties' counsel before determining that there was no prejudice. Likewise, the dissent's assertion that the trial court "showed no willingness to permit . . . live testimony" is incredible. Dissent at 50. The trial court said in no uncertain terms that it was ready to "hear testimony from" E.M. but for the failure of Godoy's counsel to comply with basic rules of evidence, and surely would have done so had Godoy's counsel brought E.M. or N.L. to the second hearing.[3] We simply do not believe that *Remmer*, *Smith*, or any other decision mandates additional hearings *ad infinitum* because defense counsel fails to offer evidence he is invited

---

[3] The dissent attempts to minimize the trial court's concern over the admissibility of N.L.'s testimony by pointing to a provision from the California Evidence Code allowing for the introduction of "statements . . . of such a character as is likely to have influenced the verdict improperly." Dissent at 50–51 n.10 (quoting Cal. Evid. Code § 1150). Yet this provision highlights rather than undermines the trial court's position, as it specifically states that only "otherwise admissible evidence" concerning juror misconduct may be considered. Cal. Evid. Code § 1150. Further, California precedent cited by the trial court clearly states that section 1150 mandates that a court must "first determine whether the affidavits supporting the motion [for a new trial] are admissible" before considering a juror's substantive testimony. *People v. Perez*, 4 Cal. App. 4th 893, 906 (1992).

to present. As such, we decline Godoy's invitation to review his claim *de novo* or to overturn the denial of his habeas petition on this ground.

IV

Godoy lastly argues that he is entitled to habeas relief despite the demanding requirements of § 2254(d) because the trial court unreasonably denied his request for a third continuance. Because Godoy's argument misunderstands Supreme Court precedent and fails to clear the high bar of AEDPA, he is not entitled to relief on this ground.

Trial courts have "broad discretion" in determining whether continuances should be granted, and "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" is constitutionally impermissible. *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). Further, even if a trial court abuses its discretion in denying a continuance, a habeas petitioner must show actual prejudice to obtain relief. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Here, the California Court of Appeal reasonably concluded that, in light of the relevant circumstances, the trial court did not abuse its discretion when it denied Godoy's motion for a continuance.

The Supreme Court has explicitly stated that there are "no mechanical tests" in deciding whether a denial of a continuance violates due process. *Ungar*, 376 U.S. at 589. Instead, "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.* Godoy cites several Ninth Circuit cases to contend that we must

balance certain specific factors in order to determine whether a denial of continuance was fair and reasonable. But Ninth Circuit cases are not "clearly established Federal law, as determined by the Supreme Court of the United States," and thus their holdings do not establish any binding test for AEDPA's purposes. 28 U.S.C. § 2254(d)(1); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2015).

Moreover, circuit precedent cannot be used to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013); *Lopez*, 135 S. Ct. at 2 ("We have emphasized, time and again, that [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'"). The Supreme Court's command in *Ungar* that a denial of a continuance must be assessed in light of "circumstances present in every case" cannot be refined by Ninth Circuit precedent into a specific review that looks only at certain factors. Instead, the correct question is whether the California Court of Appeal reasonably concluded that the trial court did not abuse its broad discretion when it denied Godoy's continuance. In light of the circumstances and reasons presented to the trial judge in this case, we find no such error in the Court of Appeal's decision.

In his motion for a continuance, defense counsel's sole argument was that he was busy with a separate murder trial and had no time to prepare a response to the prosecution's supplemental opposition to his motion for a new trial. The trial judge summarily denied the motion based upon the fact that there was "no legal cause stated." Thereafter, the Court of Appeal observed that Godoy's counsel had failed to

explain sufficiently "why he had been unable to review the first supplemental opposition when he was not actually in court." It further noted that Godoy's counsel was in trial for ten hours and five minutes during the six days between the date when he received the supplemental opposition and the date when he filed his motion for a thirty-day continuance. Likewise, the Court of Appeal remarked that Godoy's attorney did not indicate that either his case at trial or the issues raised by the prosecutor's supplemental opposition was especially demanding or complex.

Godoy argues that it is common knowledge that trial attorneys must spend many hours out of court preparing for in-court hearings and trials. He also claims that his attorney could not divulge his particular reasons for being unable to prepare for the motion without disclosing information protected by work product or attorney-client privilege. However, Godoy's counsel never contended that detailing the reasons for his inability to prepare for the hearing would require him to divulge confidential information. *See Hernandez v. Holland*, 750 F.3d 843, 859 (9th Cir. 2014) (noting that although counsel requested a continuance due to "conflicts" and "serious issues," there was no basis to find that denial of continuance was unreasonable since "counsel did not state the nature of the conflicts or serious issues" and did not request an *ex parte* hearing to "give some substance to his conclusory claims" (internal quotations omitted)). Additionally, the trial judge had already granted two continuances prior to the denial of defense counsel's June 28, 2006 motion, one at the request of Godoy's lawyer and another necessitated by his failure to disclose promised

information to the prosecutor. Those continuances had already delayed the sentencing date over two months.[4]

In short, the trial judge had several reasons for denying the motion for a continuance that were neither unreasonable nor arbitrary. In light of the broad discretion accorded to trial courts, a fairminded jurist could easily conclude that the state Court of Appeal's affirmance of the trial judge's denial of Godoy's motion for a continuance was not unreasonable.

V

Because Godoy has failed to demonstrate that his claims warrant federal habeas relief, the judgment of the district court is

**AFFIRMED.**

---

[4] The trial judge indirectly referenced these continuances in his denial of counsel's motion for continuance, commenting "It's been several months since this conviction, and I'm going forward today." Although the Court of Appeal did not explicitly mention these continuances in its decision, we think it evident that it considered them insofar as it observed that to obtain a continuance counsel must demonstrate that he "prepared for trial with due diligence."

FISHER, Circuit Judge, dissenting:

When a sitting juror is alleged to have continuously texted a judge friend about the trial and relayed the judge's information to the jury, the majority concludes the trial court need not investigate further – and the jury verdict would not violate due process. I disagree.

Just recently, in an analogous context, the Supreme Court reaffirmed that "the guarantee of an impartial jury is vital to the fair administration of justice." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1893 (2016). Because due process does not tolerate "any ground of suspicion that the administration of justice has been interfered with" by external influence, *Mattox v. United States*, 146 U.S. 140, 149 (1892), a jury must "decide the case solely on the evidence before it," and the trial judge must "determine the effect of [prejudicial] occurrences when they happen," *Smith v. Phillips*, 455 U.S. 209, 217 (1982). So obvious are these principles that *Dietz* needed no citation to conclude that, when there is even a "suggestion of prejudice," a court "should, *of course*, determine whether any juror has been directly tainted." 136 S. Ct. at 1894 (emphasis added). *Dietz* took this requirement for granted despite no allegation of extrinsic influence – only the possibility that a just-dismissed jury had been tainted before it was recalled. *See id.*

These bedrock principles are controlling here. Enrique Godoy alleged that, during trial, one of the jurors was texting a "Judge up North" about the case. Godoy presented a declaration from alternate juror N.L., which stated Juror 10 "kept continuous communication" with the "judge friend"

and relayed the judge's responses to the jury.[1]  According to N.L., throughout the trial:

> [J]uror number ten would communicate with her "judge friend" about the case [by text message].  When the jury was not sure what was going on or what procedurally would happen next, juror number ten would communicate with her friend and disclose to the jury what he said.[2]

Juror 10's text messaging plainly was an "avenue[]" for potential prejudice" to the verdict, as *Dietz* warns.  136 S. Ct. at 1895; *see id.* ("Prejudice can come through a whisper or a byte.").  Her texting "about the case" reasonably could have pertained to important procedural matters – such as why certain evidence was excluded, or how the jury was to decide the issue of guilt – that may have affected a juror's views about the case.  Especially because such continuous communications were relayed back to the jury, they were "possibly prejudicial" and "ha[d] a tendency to . . . influence" the verdict.  *Mattox*, 146 U.S. at 150.

---

[1] Godoy's counsel also offered to present live testimony from alternate juror E.M. on this claim, but the trial court granted the prosecution's request for a continuance and did not hear the testimony.  In his state habeas petition, Godoy subsequently submitted a declaration from E.M. I assume the majority is correct that this second declaration is not part of the record for purposes of our analysis. *See* Op. 19.  Even based solely on N.L.'s declaration, though, Godoy was clearly denied due process.

[2] Although N.L.'s declaration stated Juror 10 was texting during deliberations, as well, there is no indication how N.L. would have had personal knowledge of that fact.  My conclusion therefore rests only on the fact that Juror 10 was texting about the case continuously during trial.

Two consequences clearly must follow under Supreme Court authority. First, the communications were "presumptively prejudicial," meaning "the burden rest[ed] heavily upon the [state] to establish" they were, in fact, "harmless." *Remmer v. United States* (*Remmer*), 347 U.S. 227, 229 (1954). Second, Godoy was entitled to an evidentiary hearing to investigate the issue of actual prejudice. *See Smith*, 455 U.S. at 217 ("This Court has long held that the remedy for allegations of juror partiality is a hearing . . . ."). The California Court of Appeal's decision, however, was "contrary to" and "an unreasonable application of" this clearly established law. 28 U.S.C. § 2254(d)(1). Although correctly acknowledging N.L.'s declaration established the presumption of prejudice, the state court unreasonably concluded the *same* evidence rebutted it. The state court also denied Godoy an evidentiary hearing under the wrong legal rule, requiring him to demonstrate a "strong possibility" of prejudice. I would therefore remand to the district court for an evidentiary hearing and proper application of *Remmer*'s presumption of prejudice.

In upholding the state court's denial of relief, the majority permits a presumption in name alone and all but eliminates *Smith*'s hearing requirement. The majority thereby distorts the purpose of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), needlessly creates conflicts with our precedents and those of other circuits, and substantially weakens the due process guarantee of a fair trial. I respectfully dissent.

# I

Godoy argues the California Court of Appeal unreasonably concluded the *Remmer* presumption "was

rebutted" because N.L.'s declaration did not establish a "substantial likelihood of juror bias." I agree. Because the prosecution had failed to introduce any contrary evidence, the state court relied solely on Godoy's evidence to determine the issue of prejudice. In my view, it was an unreasonable application of *Remmer* to conclude the *same* evidence both established and rebutted the *Remmer* presumption. The majority makes little attempt to defend the state court's actual reasoning, but instead goes out of its way to question whether the presumption should have applied in the first place. That discussion – which is irrelevant to our AEDPA analysis – is dicta and contrary to binding precedent.

## A

The relevant clearly established law is straightforward. The right to trial before an impartial jury "absolutely forbid[s]" "[p]rivate communications, possibly prejudicial, between jurors and third persons." *Mattox*, 146 U.S. at 150. "[A]ny" such extrinsic communications "about the matter pending before the jury" are therefore "presumptively prejudicial," and "the burden rests heavily upon the [state] to establish . . . that such contact with the juror was harmless." *Remmer*, 347 U.S. at 229 (citing *Mattox*, 146 U.S. at 148–50). As the word "harmless" implies, the presumption is not rebutted unless the state shows "the absence of prejudice," *United States v. Olano*, 507 U.S. 725, 741 (1993), meaning "there is no reasonable possibility that the communication will influence the verdict," *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 697 (9th Cir. 2004) (observing that this rule is clearly established).

Although the California Court of Appeal correctly acknowledged Juror 10's misconduct "raise[d] a rebuttable

presumption of prejudice," it unreasonably concluded "[t]he presumption of prejudice . . . was rebutted" based on the *same* evidence.[3]  As a matter of common sense, N.L.'s declaration could not simultaneously establish both possible prejudice and the absence of prejudice.  If there were any doubt, *Remmer* itself made this point clear.  Where the lower courts had inferred from some of the defendant's evidence that the alleged offer to bribe a juror "had been made in jest," *Remmer v. United States*, 205 F.2d 277, 291 (9th Cir. 1953), the *Remmer* Court reversed, stressing that, because a presumption of prejudice attached to the facts alleged by the defendant, "the burden rest[ed] heavily" on the government to show the contact was, *in fact*, "harmless," 347 U.S. at 229. The *Remmer* presumption thus cannot be rebutted simply by drawing contrary inferences from the very evidence establishing the presumption.  If it could, every showing that a communication was "possibly prejudicial" would be rebutted by the mere inference that the communication was not prejudicial.

The majority disagrees because, in its view, *Remmer* does not clearly require the introduction of contrary evidence to rebut the presumption.  *See* Op. 17–18.  But *Remmer* did not need to spell out this requirement: it is intrinsic to the very definition of a "presumption."  *See Black's Law Dictionary*

---

[3] The majority notes the California Court of Appeal applied the presumption "under California law."  Op. 16.  That was tantamount to a conclusion the presumption applied under federal law as well.  The California Supreme Court has repeatedly derived the rebuttable presumption from *Remmer* itself.  *See, e.g.*, *In re Price*, 247 P.3d 929, 938 (Cal. 2011); *People v. Danks*, 82 P.3d 1249, 1282 (Cal. 2004).  And it has held California's "standard for determining prejudice resulting from juror misconduct" is not "inconsistent with federal law."  *People v. Loker*, 188 P.3d 580, 622 (Cal. 2008).

1304 (9th ed. 2009) (defining "presumption" as "calling for a certain result . . . unless the adversely affected party overcomes it *with other evidence*" (emphasis added)); *id.* at 1306 (defining "rebuttable presumption" as "[a]n inference" that "may be overcome *by the introduction of contrary evidence*" (emphasis added)).  It is black-letter law that a presumption cannot be rebutted where, as here, the opposing party fails to introduce contrary evidence.  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) ("[I]f [one party] is silent in the face of the presumption, the court must enter judgment for [the other party] because no issue of fact remains in the case."); *Lincoln v. French*, 105 U.S. 614, 617 (1881) ("Like other presumptions, it was sufficient to control the decision of the court if no rebutting testimony was produced.").  Tellingly, the majority points to no other "presumption" that can be rebutted in this manner.

Given the record here, no fairminded jurist could conclude the state court actually *presumed* prejudice.  The only question the state court considered was whether Godoy's evidence *established* prejudice.  The court thus faulted N.L.'s declaration for indicating the text messages "related to procedural matters" and failing to "suggest[] that the 'judge friend' communicated information prejudicial to [Godoy]." The majority assumes the state court presumed prejudice because it used the magical words "presumption" and "rebutted."  Op. 17.  I do not think due process can be evaded so easily.  *Cf. Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("[P]rocess which is a mere gesture is not due process.").  The state court applied a presumption in name alone; that is not a reasonable application of *Remmer*.

The majority also suggests the *Remmer* presumption is merely a tie-breaker that applies when the court cannot determine the nature of the alleged prejudice. Op. 18–19. Even assuming this narrow view of the presumption is reasonable, the state court's decision was unreasonable because it resolved a tie *against* Godoy. The state court concluded, "[n]othing in [N.L.'s] declaration suggests that the 'judge friend' communicated information prejudicial to [Godoy]" – even though it was unclear whether Juror 10's texting "about the case" included procedural matters that may have affected a juror's views about the case. Juror 10 reasonably could have been texting about, for example, why certain evidence was excluded or how the jury was to determine guilt. Because the state court could not determine – either way – whether the text messages actually concerned non-prejudicial matters, it could not resolve this ambiguity against Godoy. The state court's application of *Remmer* was therefore unreasonable.

## B

The majority explains at length why it is "skeptical" that *Mattox* and *Remmer* clearly established that Godoy was "entitled . . . to a presumption of prejudice" at all. Op. 14–15. Because the state court applied the presumption of prejudice, however, that extended discussion is irrelevant to our AEDPA analysis. *See Frantz v. Hazey*, 533 F.3d 724, 738 (9th Cir. 2008) (en banc) ("[I]f we were to defer to some *hypothetical* alternative rationale when the state court's *actual* reasoning evidences a § 2254(d)(1) error, we would distort the purpose of AEDPA."). And because the majority ultimately assumes the presumption applied, its discussion of the issue is dicta. But even on its own terms, the majority is wrong: the presumption clearly applied because Juror 10's

communications were "possibly prejudicial." *Mattox*, 146 U.S. at 150. The majority's attempt to walk back this clearly established law needlessly creates conflicts with our precedents.

**1**

We have already held it is clearly established that "[p]rejudice is presumed" where, as here, "[a] communication is possibly prejudicial" in that "it raises a risk of influencing the verdict." *Caliendo*, 365 F.3d at 697. For good reason. Even by the time of *Mattox*, it was "text-book[]" law that "unauthorized communications having a tendency to adverse influence" can be "fatal to verdicts." 146 U.S. at 150. As *Mattox* explained, "the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiassed [sic] judgment." *Id.* at 149. *Mattox* thus established that "possibly prejudicial" private communications "between jurors and third persons, or witnesses, or the officer in charge . . . invalidate the verdict" unless they are rebutted. *Id.* at 150. This was not a high bar: *Mattox* made clear that "*any* . . . suspicion" of extrinsic influence cannot be "tolerated." 146 U.S. at 149 (emphasis added).

This rule was obvious in *Remmer*, too. There, the Supreme Court needed no authority to conclude, "any private communication . . . with a juror during a trial about the matter pending before the jury is, *for obvious reasons*, deemed presumptively prejudicial." 347 U.S. at 229 (emphasis added). Relying on *Mattox*, *Remmer* observed that the presumption of prejudice "is not conclusive," but the government bears the "heav[y]" burden to establish "such contact with the juror was harmless to the defendant." *Id.*

(citing *Mattox*, 146 U.S. at 148–50). The Court then applied the presumption to a vague allegation of jury tampering even though the record did not indicate "what actually transpired, or whether the incidents that may have occurred were harmful or harmless." *Id.* Again, this was not a high bar: *Remmer* reasoned that "[t]he integrity of jury proceedings" cannot be tainted by *any* "unauthorized invasions." *Id.*

These authorities clearly establish that, to be presumptively prejudicial, an extrinsic juror communication need only "cross[] a low threshold to create the potential for prejudice." *Caliendo*, 365 F.3d at 697. Our own cases have repeatedly recognized this "bright-line rule." *Tarango*, 815 F.3d at 1221 ("*Mattox* established a bright-line rule: any external contact with a juror is subject to a presumption that the contact prejudiced the jury's verdict . . . ."); *Tong Xiong v. Felker*, 681 F.3d 1067, 1077 (9th Cir. 2012) (holding that *Mattox* and *Remmer* "establish[] the widely accepted bright-line rule that a finding of jury misconduct gives rise to a presumption of prejudice"); *Caliendo*, 365 F.3d at 697 ("The *Mattox* rule applies when an unauthorized communication with a juror crosses a low threshold to create the potential for prejudice.").

As explained above, Juror 10's continuous texting about the case was "possibly prejudicial" and had a "tendency to adverse influence." *Mattox*, 146 U.S. at 150. "[F]or obvious reasons," then, the communications were presumptively prejudicial. *Remmer*, 347 U.S. at 229.

**2**

The majority asserts three reasons why the presumption of prejudice might not have clearly applied here. Given our binding precedent to the contrary, none is persuasive.

First, relying on *United States v. Dutkel*, 192 F.3d 893, 895–86 (9th Cir. 1999), the majority contends *Remmer* announced a "special rule" that applies only in the jury tampering context. Op. 14–15. I disagree. Although *Remmer* itself applies only to jury tampering, the *presumption of prejudice* is not so limited. *Dutkel* recognized that other types of juror misconduct were controlled by post-*Remmer* cases, *see* 192 F.3d at 895 n.1, and we have since concluded that subsequent Supreme Court authority "did not signal a retreat from *Mattox*' well-settled rule." *Caliendo*, 365 F.3d at 697 n.3. We have repeatedly held, accordingly, that *Mattox* – not *Remmer* – clearly establishes the presumption of prejudice with respect to extrinsic communications. *See, e.g.*, *Tong Xiong*, 681 F.3d at 1077–78; *Caliendo*, 365 F.3d at 697. Moreover, what is "special" about jury tampering is not that it is presumptively prejudicial, but that a credible allegation of tampering automatically gives rise to the presumption, *see Dutkel*, 192 F.3d at 895, whereas for extrinsic communications "the defendant must show that the communication[s] could have influenced the verdict before the burden of proof shifts to the prosecution," *Caliendo*, 365 F.3d at 696. That distinction is immaterial here, however, because Godoy satisfied this burden.

Second, the majority tries to distinguish *Mattox* and *Remmer* as involving communications concerning "the matter pending before the jury." Op. 14–15 (quoting *Remmer*, 347 U.S. at 229). We have already rejected this argument. *See*

*Caliendo*, 365 F.3d at 697 ("Nothing in *Mattox* suggests that for the rebuttable presumption to attach, the substance of the extrinsic contact must factually relate to the trial."). Regardless, Juror 10's continuous texting "about the case" plainly pertained to the matter before the jury. Because the text messages could have pertained to important procedural matters, such as why certain evidence was excluded or how the jury was to decide the issue of guilt, it is immaterial that N.L.'s declaration did not also say explicitly that the texts concerned Godoy's guilt or innocence. The texts were "possibly prejudicial" and hence presumptively prejudicial. *Mattox*, 146 U.S. at 150.

Third, the majority tries to limit *Caliendo*'s binding interpretation of *Mattox* as applying only where a juror communicates with a "witness" or "interested party." Op. 14–15. In fact, we held in *Caliendo* that "[t]he *Mattox* Court spoke in *categorical* terms, mandating that 'possibly prejudicial' out-of-court communications between jurors and outside parties" are presumptively prejudicial. 365 F.3d at 697 (emphasis added) (quoting *Mattox*, 146 U.S. at 150). Our holding was sound: *Mattox* clearly established in the same sentence that "possibly prejudicial" communications with "witnesses" *and* with "third persons" (*i.e.*, outside parties) are presumptively prejudicial. 146 U.S. at 150.

Because the presumption of prejudice clearly applied – and was applied by the state court – the majority's extensive dicta are inconsistent with AEDPA, sow needless confusion in the law and create multiple conflicts with our precedent.

## II

At this point, having concluded the California Court of Appeal unreasonably applied *Remmer*, we normally would determine de novo whether there was actual prejudice. *See, e.g.*, *Caliendo*, 365 F.3d at 698. I would not do so here, though, because the deficiencies in the state court's analysis arose from its failure to order an evidentiary hearing. I would therefore grant Godoy's alternative request for an evidentiary hearing. As it turns out, that disposition is independently warranted because the state court also denied Godoy an evidentiary hearing under the wrong legal rule, and Godoy plainly was entitled to some sort of hearing.

## A

The California Court of Appeal concluded Godoy was not entitled to any evidentiary hearing because he had "failed to demonstrate a '*strong* possibility that prejudicial misconduct [had] occurred.'" That decision was contrary to clearly established Supreme Court authority requiring an evidentiary hearing whenever the alleged misconduct is *potentially* prejudicial. The majority's contrary view substantially weakens due process and misconstrues our precedents.

## 1

The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing." *Smith v. Phillips*, 455 U.S. 209, 215 (1982). *Mattox* observed that "possibly prejudicial" extrinsic communications "invalidate the verdict, at least unless their harmlessness is made to appear." 146 U.S. at 150. Accordingly, when such a communication occurs, a trial court must "determine . . . whether or not [the

communication] was prejudicial, *in a hearing* with all interested parties permitted to participate." *Remmer*, 347 U.S. at 229–30 (emphasis added). This requirement is commanded by due process, which imposes on trial courts "a serious duty to determine the question of actual bias" when juror misconduct is alleged. *Dennis v. United States*, 339 U.S. 162, 168, 171–72 (1950); *see also Smith*, 455 U.S. at 217 ("Due process means . . . a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.").[4]

As the Supreme Court has explained, it is "manifest" that a "full hearing" is required where – as here – the presumption of prejudice attaches yet the prejudicial effect of the communications, if any, is unclear from the record. *Remmer II*, 350 U.S. at 379–80; *see Tanner v. United States*, 483 U.S. 107, 120 (1987) ("The Court's holdings requir[e] an evidentiary hearing where extrinsic influence or relationships have tainted the deliberations . . . ."). We have concluded, as well, a hearing is clearly required where "a potentially prejudicial contact is alleged." *Tarango*, 815 F.3d at 1224. A trial court has flexibility to determine the *form* of the hearing so long as the "investigation [is] reasonably calculated to resolve the doubts raised about the juror's impartiality." *Dyer v. Calderon*, 151 F.3d 970, 974–75 (9th Cir. 1998) (en banc). But some kind of "hearing" is required.

---

[4] *Mattox*, for example, required a trial court to admit and consider juror affidavits concerning what effect a newspaper article had on the jury's deliberations because the article had a "tendency" to be "injurious to the defendant." 146 U.S. at 150–51. Similarly, *Remmer* required a "full hearing" to determine the effect of alleged jury tampering because of the "paucity of information relating to the entire situation" and the presumption of prejudice that attached to the improper communications. *Remmer v. United States* (*Remmer II*), 350 U.S. 377, 379–80 (1956).

*Tanner*, 483 U.S. at 120; *Smith*, 455 U.S. at 215; *Remmer II*, 350 U.S. at 380; *Remmer*, 347 U.S. at 229; *see also Tarango*, 815 F.3d at 1224.

The California Court of Appeal did not apply this "potentially prejudicial" standard, but instead denied Godoy an evidentiary hearing because he had failed to show a "strong possibility" of prejudice. Although the state contended at oral argument that California's "strong possibility" standard was identical to the federal standard, the two cases the state cited dealt with a different standard – namely, that required for proving actual prejudice. *See People v. Thomas*, 269 P.3d 1109, 1147 (Cal. 2012); *People v. Loker*, 188 P.3d 580, 622 (Cal. 2008). Neither case used the phrase "strong possibility" or even considered when an evidentiary hearing is required. In a similar context, we have concluded that California's "strong likelihood" standard is contrary to federal law requiring only a "reasonable" inference of a certain outcome. *See, e.g.*, *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000) ("California courts in following the 'strong likelihood' language of [California precedent] are not applying the correct legal standard for a *prima facie* case under *Batson*.").

I would reach the same conclusion here. Because the state court denied Godoy an evidentiary hearing under the wrong legal rule, its decision was contrary to clearly established Supreme Court authority.

## 2

In reasoning that Godoy was not clearly entitled to a hearing, the majority all but eliminates the due process guarantees that *Smith* and *Remmer* establish once the

presumption arises, as here. In the majority's view, *Smith* and *Remmer* do not require a hearing at all – only that a trial court determine the effect of the extrinsic communication. *See* Op. 20–23. So long as the trial court considers the defendant's proffer of evidence of juror partiality and rules on the motion for a new trial, it has provided all the process *Smith* and *Remmer* require. *See id.* 25–27.

This approach cannot be reconciled with *Smith*'s command that the very "remedy" for such allegations is itself "a hearing." 455 U.S. at 215. There are two steps in the process. A court first determines, based on the defendant's proffer, whether the communication is possibly prejudicial such that the presumption attaches. If not, no further inquiry is necessary. If the communication is possibly prejudicial, an evidentiary hearing is warranted. *See, e.g.*, *Remmer II*, 350 U.S. at 380. Only then, at step two, does the court conduct the hearing required by *Smith* and *Remmer*. The California Court of Appeal here focused only on step one, unreasonably concluding that – although Godoy's evidence was sufficient to trigger the presumption of prejudice – he was not entitled to an evidentiary hearing at step two. By contrast, the majority collapses the two steps, reasoning that the state court's consideration of Godoy's proffer at step one *was* the hearing required by *Smith* and *Remmer*. By eliminating any hearing at step two, notwithstanding the state court's initial presumption of prejudice, the majority ignores the Supreme Court's repeated instruction that a *hearing* is required. *See, e.g.*, *Smith*, 455 U.S. at 215; *Remmer II*, 350 U.S. at 380; *Remmer*, 347 U.S. at 229.

The majority's truncated approach rests on the mistaken assumption that, because *Remmer* and *Smith* provide a "flexible rule," *Tracey v. Palmateer*, 341 F.3d 1037, 1044

(9th Cir. 2003), neither decision ever clearly requires a hearing. *See* Op. 22–23. We explained in *Tracey*, however, that this "flexible rule" means only that a "hearing is not mandated *every* time there is an allegation of jury misconduct or bias." 341 F.3d at 1044 (quoting *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993)). *Tracey* expressly derived this proposition from *Angulo*, where we clarified, "In cases in which courts have not required an evidentiary hearing, the facts have shown *clearly* that the alleged misconduct or bias simply could not have affected the verdict." 4 F.3d at 847 n.7 (emphasis added). Every case *Tracey* cited for this flexibility likewise held that no hearing is required when there is no reasonable possibility of prejudice and hence no presumption of prejudice.**[5]** In short, *Remmer* and *Smith* are flexible enough that they do not require a hearing when an extrinsic communication clearly could not have been prejudicial. But their flexibility ends there.

Neither *Sims v. Rowland*, 414 F.3d 1148 (9th Cir. 2005), nor *Tracey* concluded a court can reasonably refuse to conduct an evidentiary hearing once the presumption of prejudice arises. On the contrary, *Sims* expressly recognized that due process "forbids a trial judge from remaining idle in the face of evidence indicating probable juror bias." *Id.* at 1156. Because "Sims ha[d] alleged, at most, incidental and

---

**[5]** *See United States v. Hanley*, 190 F.3d 1017, 1031 (9th Cir. 1999) (holding no hearing was required where the alleged "vague statements did not expose Defendants to unfair prejudice"); *United States v. Langford*, 802 F.2d 1176, 1180 (9th Cir. 1986) (holding no hearing was required where the allegations were "insufficient to support a finding of a reasonable possibility [of prejudice]"); *United States v. Halbert*, 712 F.2d 388, 389 (9th Cir. 1983) (holding no hearing was required where there was "no reasonable possibility" of prejudice because the court "knew the exact scope and nature" of the allegedly prejudicial information).

unintentional juror influence" and had never requested an evidentiary hearing, we had no occasion to consider whether *Smith* and *Remmer* require an evidentiary hearing where the defendant alleges potentially prejudicial juror misconduct. *Id.* Similarly, the trial judge in *Tracey* actually conducted a hearing in which a juror testified about allegedly biased comments she had overheard from two other jurors. *See* 341 F.3d at 1039–40. We held that a "more elaborate hearing" to question the two jurors was not required because "[t]he allegations lacked specificity and noted a bias that, even if true, was not caused by outside influences and occurred before the presentation of evidence of the murder." *Id.* at 1045. Again, we simply did not consider whether a hearing is required where the communication is potentially prejudicial and hence presumptively prejudicial.

The majority thus cites no authority – anywhere – for denying a hearing when there is evidence of *potentially* prejudicial extrinsic communications. In fact, the majority's holding conflicts with *Tarango* and at least four other circuits.**[6]** That the California Court of Appeal required a

---

**[6]** *Tarango*, 815 F.3d at 1224 ("Once a potentially prejudicial contact is alleged, the court should 'determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, *in a hearing* with all interested parties permitted to participate.'" (emphasis added) (quoting *Remmer*, 347 U.S. at 230)); *See Barnes v. Joyner*, 751 F.3d 229, 242 (4th Cir. 2014) ("*Remmer* clearly established . . . a defendant's entitlement to an evidentiary hearing . . . when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury."); *Stouffer v. Trammell*, 738 F.3d 1205, 1214 (10th Cir. 2013) ("The trial court's duty to conduct a *Remmer* hearing when genuine concerns of improper juror contact arise is clearly established by the Supreme Court."); *Garcia v. Andrews*, 488 F.3d 370, 375 (6th Cir. 2007) (observing the Supreme Court has established "an evidentiary hearing . . . is required . . . where 'extrinsic

*strong possibility* of prejudice therefore stretches *Remmer* and *Smith* beyond their breaking point.

## B

In addition to weakening the guarantees of due process, the majority distorts the purpose of AEDPA. Where the state court unreasonably concluded Godoy was not entitled to *any* evidentiary hearing, the majority upholds that decision because, in its view, the trial court had already provided two hearings and was not clearly required to provide another. *See* Op. 25. That approach is "inconsistent with AEDPA deference" because it ignores the California Court of Appeal's "*actual* reasoning," *Frantz*, 533 F.3d at 738 – which assumed there was no hearing at all.[7] Regardless, the majority's approach is again erroneous on its own terms.

Even on the majority's assumption that Godoy received a "hearing," that "hearing" plainly did not comport with due process because it was not "reasonably calculated to resolve the doubts raised about the juror's impartiality." *Dyer*, 151 F.3d at 974–75. The trial court had the affidavit of

influence or relationships have tainted the deliberations'" (quoting *Tanner*, 483 U.S. at 120)); *Willard v. Pearson*, 823 F.2d 1141, 1148 (7th Cir. 1987) ("Due process requires . . . that the trial court hold a hearing to determine if the potentially compromising situation has . . . actually prejudiced the defendant.").

[7] The majority's insistence that there were multiple "hearings" is baffling. The trial court never heard live testimony; and it considered N.L.'s declaration not at an "evidentiary hearing," but as part of Godoy's initial offer of proof to support his motion for a new trial. Everyone – including the prosecutor, the trial court and the California Court of Appeal – agreed there was no "hearing." Indeed, the very issue before the court was whether a hearing was required.

alternate juror N.L., but did not seek to question N.L. or Juror 10 about the texting. The trial court also was aware that alternate juror E.M. wanted to testify – and even put her on the stand to obtain her contact information – but did not seek to question her either. Such questioning could have clarified the content and frequency of the text messages, as well as the extent to which they were communicated to the jury. But because the trial court failed to conduct any such investigation, it could not resolve doubts about the jurors' impartiality. The trial court thus plainly failed to ascertain "the circumstances, the impact thereof upon the juror" and whether Juror 10's texting was, in fact, prejudicial. *Remmer*, 347 U.S. at 230.

The majority disagrees primarily because it thinks the trial court "was ready to 'hear testimony from' E.M. but for the failure of Godoy's counsel to comply with basic rules of evidence." Op. 26. Not so. At the initial motions hearing, the trial court repeatedly said it had not yet "ma[d]e a decision whether we will hear testimony."**[8]** The issue the court put over, then, was not E.M.'s actual testimony but *whether* to hear that testimony. The trial court refused to decide that issue until the prosecution could interview the witness or receive the witness' statement. As Godoy's counsel explained, he had not provided that information sooner because he "didn't have it." Yet even after he subsequently gave the prosecution a witness statement from alternate juror N.L., and the prosecution had the opportunity

---

**[8]** The trial court stated in no uncertain terms it "ha[d]n't made a final decision on" whether to hear live testimony; asked the prosecution if it needed more time "before we decide whether we're going to hear from this witness"; and stressed it would give the prosecution "more time on . . . whether we're going to hear testimony from somebody today."

to interview alternate juror E.M.,**[9]** the trial court still did not invite Godoy to present live testimony, but told counsel – no fewer than four times – he could "continue [his] *argument*."

The majority nevertheless assumes the trial court "surely would have" heard the testimony "had Godoy's counsel brought E.M. or N.L. to the second [motions] hearing." Op. 26. Wrong again. When defense counsel mentioned that the court had refused to permit E.M. to testify, the trial court asked, "I said where is your affidavit? . . . You didn't give me an affidavit." Despite counsel's objection that it was "rock solid reversible error" not to hold an evidentiary hearing under the circumstances, the trial court repeatedly insisted he provide *affidavits* instead. Counsel observed, "[t]here is no requirement that affidavits are the only way that misconduct can be brought to the court's attention," and the court's "choos[ing] to do nothing about [E.M.]" was "reversible error." Yet the trial court persisted, permitting counsel only to continue his argument "including [any] juror's affidavit." The trial court showed no willingness to permit – let alone invite or compel – live testimony.**[10]**

---

**[9]** Godoy did not submit a witness statement from alternate juror E.M. until he filed his state habeas petition.

**[10]** Contrary to the majority's assertion, the trial judge never expressed any concerns about the admissibility of N.L.'s testimony. *Cf.* Op. 26 n.3. Rather, the trial court was concerned that *E.M.'s* testimony might be inadmissible because "[a] juror can't impeach their verdict." But California law permits "*any* otherwise admissible evidence" – including testimony – "as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly." Cal. Evid. Code § 1150 (West 2006) (emphasis added). Because the trial court gave no indication it would permit testimony as to even these matters, its investigation could

At bottom, the majority fundamentally confuses a defendant's burden to establish potential prejudice – which Godoy did – with the trial court's independent duty to investigate the actual impact on the jury and, where necessary, compel testimony. *Cf. Dyer*, 151 F.3d at 978 ("Where juror misconduct or bias is credibly alleged, the trial judge cannot wait for defense counsel to spoon feed him every bit of information which would make out a case of juror bias; rather, the judge has an independent responsibility to satisfy himself that the allegation of bias is unfounded."). Because the trial court made no meaningful attempt to investigate "the circumstances, the impact thereof upon the juror, and whether or not [Juror 10's texting] was prejudicial," Godoy was clearly deprived of due process. *Remmer*, 347 U.S. at 230.   I would therefore vacate the judgment and remand for the evidentiary hearing to which Godoy is entitled. *See, e.g.*, *Tarango*, 815 F.3d at 1227.

### III

I acknowledge the majority's concerns that Godoy's counsel could have been prompter and better prepared.  But the unfortunate lawyering in this case provides no basis for denying Godoy basic guarantees of due process.  *Dietz* reminds us that the inquiry here should have been simple: Godoy raised a "suggestion of prejudice," so "*of course*" the state court should have "determine[d] whether any juror ha[d] been directly tainted." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1894 (2016) (emphasis added).  Instead of doing that, the California Court of Appeal denied an evidentiary hearing under the wrong legal rule, then unreasonably applied

not have reasonably ascertained the actual circumstances or impact of the communications on the jury. *See Remmer*, 347 U.S. at 230.

*Remmer* in concluding the presumption of prejudice was rebutted.  By whitewashing those errors, the majority's opinion erodes the very protections *Dietz* – like its predecessors – found "vital to the fair administration of justice." *Id.* at 1893.  I respectfully dissent.